# United States Court of Appeals
## For the First Circuit

No. 18-1214

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as representative for the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as representative for the Puerto Rico Highways and Transportation Authority,

Debtors.

AMBAC ASSURANCE CORPORATION,

Plaintiff, Appellant,

v.

COMMONWEALTH OF PUERTO RICO, through the Secretary of Justice; FINANCIAL OVERSIGHT AND MANAGEMENT BOARD; PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY, through the Secretary of Justice; PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY, through the Secretary of Justice; RICARDO ROSSELLO NEVARES, through the Secretary of Justice; RAUL MALDONADO GAUTIER, through the Secretary of Justice; JOSE IVAN MARRERO-ROSADO; JOSE B. CARRION, III; CHRISTIAN SOBRINO VEGA; ANDREW G. BIGGS; CARLOS M. GARCIA; ARTHUR J. GONZALEZ; JOSE R. GONZALEZ; ANA J. MATOSANTOS; DAVID A. SKEEL, JR.; ELIAS SANCHEZ,

Defendants, Appellees,

OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

Intervenor,

JOHN DOES 1-12,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Laura Taylor Swain, U.S. District Judge[*]]

---

Before

Torruella, Lipez, and Kayatta,
Circuit Judges.

---

Atara Miller, with whom Dennis F. Dunne, Andrew M. Leblanc, Grant F. Mainland, Milbank, Tweed, Hadley & McCloy LLP, Roberto A. Cámara-Fuertes, and Ferraiouli LLC were on brief, for appellant.

Mark C. Ellenberg, Howard R. Hawkins, Jr., Lary Stromfeld, Ellen V. Holloman, Gillian Groarke Burns, Thomas J. Curtin, Casey Servais, Cadwalader, Wickersham & Taft LLP, Heriberto Burgos Pérez, Ricardo F. Casellas-Sánchez, Diana Pérez-Seda, Casellas Alcover & Burgos, Maria E. Picó, Rexach & Picó, CSP, Martin A. Sosland, Jason W. Callen, and Butler Snow LLP on brief for Assured Guaranty Corporation, Assured Guaranty Municipal Corporation, and Financial Guaranty Insurance Company, amici curiae.

Vincent Levy, Daniel M. Sullivan, Margot Hoppin, Evan H. Stein, and Holwell Shuster & Goldberg LLP on brief for Professor John W. Ely, Jr., amicus curiae.

Bruce R. Zirinsky and Zirinsky Law Partners LLC on brief for Representative Rob Bishop, amicus curiae.

Martin J. Bienenstock, with whom Stephen L. Ratner, Mark D. Harris, Michael A. Firestein, Lary Alan Rappaport, Timothy W. Mungovan, John E. Roberts, Proskauer Rose LLP, Hermann D. Bauer-Alvarez, and O'Neill & Borges LLC were on brief, for appellee Financial Oversight and Management Board for Puerto Rico.

Peter M. Friedman, with whom Isaías Sánchez-Báez, Solicitor General of Puerto Rico, Carlos Lugo-Fiol, John J. Rapisardi, Elizabeth L. McKeen, Ashley M. Pavel, O'Melveny & Myers LLP, Luis Marini, and Marini Pietrantoni Muñoz, LLC were on brief, for appellees the Puerto Rico Fiscal Agency and Financial Advisory Authority, Christian Sobrino Vega, Ricardo Rosselló Nevares, Raul Maldonado Gautier, and Jose Ivan Marrero Rosado.

Paul S. Samson, Riemer & Braunstein LLP, Gregory E. Garman, Erick T. Gjerdingen, and Garman Turner Gordon LLP on brief for Congressman Raúl Grijalva, ranking member of the House Committee on Natural Resources, and Congresswoman Nydia Velázquez, member of

---

[*]Of the Southern District of New York, sitting by designation.

the House Committee on Natural Resources, amici curiae.

 Luc A. Despins, with whom Nicholas A. Bassett, Paul Hastings LLP, Juan J. Casillas Ayala, and Casillas, Santiago & Torres LLC were on brief, for the Official Committee of Unsecured Creditors of All Puerto Rico Title III Debtors (Other than COFINA).

—————

June 24, 2019

—————

**KAYATTA**, **Circuit Judge**. Ambac is a financial guaranty insurer and individual holder of Puerto Rico Highways and Transportation Authority (HTA) bonds. In this Title III adversary proceeding arising within HTA's debt-adjustment proceedings pursuant to the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA), Ambac brings constitutional and statutory challenges to measures the Commonwealth of Puerto Rico has taken to block payments to holders of HTA bonds. Because the Title III court lacks the authority to grant the declaratory and injunctive relief that Ambac seeks, we affirm the dismissal of Ambac's claims.

## I.

Because this appeal comes before us from the dismissal of Ambac's constitutional and statutory claims, "we take as true the facts presented in [Ambac's] complaint and draw all reasonable inferences in [its] favor." Maloy v. Ballori-Lage, 744 F.3d 250, 251 (1st Cir. 2014).

HTA develops, operates, and maintains Puerto Rico's highways and transportation infrastructure. It has the ability to issue bonds to finance its operations pursuant to the Puerto Rico Highways and Transportation Authority Act, P.R. Laws Ann. tit. 9, § 2012. In 1968 and 1998, HTA adopted resolutions issuing bonds. The resolutions set forth the contractual relationship between HTA and bondholders and "pledge[]" for the payment of "principal, interest and premiums" certain "[r]evenues" and "funds received by

[HTA] . . . from the Commonwealth" (referred to here as "HTA revenues"). P.R. Highways & Transp. Authority, Resolution No. 98-06, at 58 [hereinafter 1998 Resolution]; see also P.R. Highways & Transp. Authority, Resolution No. 68-18, at 50 [hereinafter 1968 Resolution]. The HTA revenues include, among other funds: (1) "all moneys received by [HTA] on account of the crude oil tax allocated to [HTA] by Act No. 34"; (2) proceeds from gasoline and oil taxes and from annual motor-vehicle license fees; (3) "any tolls or other charges imposed by [HTA]"; and (4) "the proceeds of any other taxes, fees or charges" that the Puerto Rico legislature authorizes for payment of "principal of and interest on bonds or other obligations of [HTA]." 1998 Resolution at 7, 13; see also 1968 Resolution at 11 (employing a similar definition of HTA revenues).

The bond resolutions require HTA to deposit the HTA revenues on a monthly basis with a fiscal agent, the Bank of New York Mellon, which holds the funds in trust for bondholders and then pays bondholders in accordance with the terms of the resolutions. 1998 Resolution at 47; 1968 Resolution at 42. The resolutions further provide that the bondholders' interest in the HTA revenues is paramount, subject to one qualification: Commonwealth law requires that revenues be used to first pay interest and amortization of the public debt (i.e., general obligation bonds) in years in which other available resources are

- 5 -

insufficient to meet appropriations.  See P.R. Const. art. VI, § 8; see also 1998 Resolution at 19; 1968 Resolution at 17.[1]

A succession of related events upset the parties' contractual arrangement concerning the HTA revenues, giving rise to this lawsuit.  In brief, the Commonwealth and Governor of Puerto Rico promulgated a series of laws and executive orders -- known as the "Moratorium Laws and Orders" -- that halted the flow of revenues from the Commonwealth and HTA to the fiscal agent for payment to bondholders and, instead, directed those revenues to the payment of other, ordinary Commonwealth expenses.[2]  The Moratorium Laws and Orders also stayed creditor remedies to enforce their contractual rights under the bondholder resolutions.

---

[1] Ambac alleges that the HTA revenues fall within the category of "special revenues" as defined in the municipal-bankruptcy code, see 11 U.S.C. § 902(2); 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. § 902 into PROMESA), and that it has a security interest in all such revenues.  Intervenor the Official Committee of Unsecured Creditors of All Puerto Rico Title III Debtors (Other than COFINA) contests at least the latter point and urges us to construe Ambac's security interest narrowly as extending only to HTA revenues actually deposited with the fiscal agent.  As will become evident, the resolution of this issue is not necessary to settle the immediate appeal.

[2] See, e.g., Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, P.R. Laws Ann. tit. 3, §§ 9282–9288 (codifying then-Governor Alejandro García Padilla's moratorium orders and granting him the authority to suspend the Commonwealth's debt obligations); see also Puerto Rico Financial Emergency and Fiscal Responsibility Act, P.R. Laws Ann. tit. 3, §§ 9431–9437 (indefinitely continuing the moratorium orders).

Thereafter, the Financial Oversight and Management Board for Puerto Rico ("Oversight Board") -- established by PROMESA, 48 U.S.C. §§ 2101-2241, and tasked with "provid[ing] a method for [Puerto Rico] to achieve fiscal responsibility and access to the capital markets," id. § 2121(a) -- certified a "Fiscal Plan" for Puerto Rico to which all Commonwealth laws and budgets must conform, see id. §§ 2141(c), 2144(a)-(c). The Fiscal Plan calls for the continued diversion of HTA revenues over the course of the next decade.[3] The Oversight Board, pursuant to its authority under section 304 of PROMESA, id. § 2164(a), subsequently initiated Title III debt-adjustment proceedings on behalf of HTA, which also triggered an automatic stay of actions to collect preexisting debts from the agency, 11 U.S.C. § 362(a)(1), (5); 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. § 362). The Puerto Rico Fiscal Agency and Financial Advisory Authority (AAFAF) then ordered the Bank of New York Mellon, as fiscal agent, to halt payments to HTA bondholders, reasoning that the funds held in trust are still the property of the Commonwealth and their application to HTA bonds would violate the automatic stay. In July 2017, HTA defaulted on a bond payment in the amount of $219 million.

Ambac, which is both a holder and insurer of the defaulted HTA bonds, commenced this adversary action in the so-

---

[3] In April 2018, the Oversight Board certified a new Fiscal Plan that continues the diversion of HTA revenues.

called "Title III court," bringing Contracts Clause, Takings Clause, Due Process Clause, preemption, and statutory challenges to the Commonwealth's actions. Ambac asked that court to declare as null the Moratorium Laws and Orders and the Fiscal Plan, and it sought a negative injunction preventing the Commonwealth from continuing to impair the flow of HTA revenues to bondholders. The Title III court carefully reviewed and rejected all of Ambac's requested relief, dismissing the complaint with prejudice. See Ambac Assurance Corp. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.), 297 F. Supp. 3d 269 (D.P.R. 2018). Ambac then filed this timely appeal.

## II.

Two sections of PROMESA prevent the Title III court from granting the relief that Ambac requests in this adversary proceeding.

## A.

Section 106 of PROMESA provides: "There shall be no jurisdiction in any United States district court to review challenges to the Oversight Board's certification determinations under this chapter." 48 U.S.C. § 2126(e). As this court recently explained, "PROMESA grants the Board exclusive authority to certify Fiscal Plans and Territory Budgets for Puerto Rico. It then insulates those certification decisions from judicial review . . . ." Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for

- 8 -

P.R., (In re Fin. Oversight & Mgmt. Bd. for P.R.), 916 F.3d 98, 112 (1st Cir. 2019). In its First Amended Complaint, Ambac repeatedly requests "injunctive relief invalidating the Oversight Board's certification of the Fiscal Plan." This relief is plainly precluded as a result of section 106 and our holding in Méndez-Núñez.

**B.**

Section 305 of PROMESA states, in relevant part:

[N]otwithstanding any power of the court, unless the Oversight Board consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with -- (1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the use or enjoyment by the debtor of any income-producing property.

48 U.S.C. § 2165. The provision mimics, in all pertinent respects, the analogous section 904 of the municipal-bankruptcy code. See 11 U.S.C. § 904.

Ambac seeks declaratory and injunctive relief that would require the Title III court to directly interfere with the "political or governmental powers" and "property or revenues" of the Commonwealth and HTA, at least as to those HTA revenues that have yet to be transferred to the fiscal agent and remain in the possession of the Commonwealth. Specifically, Ambac requests injunctive relief that would compel the Commonwealth's remittance of toll revenues, vehicles fees, and excise taxes to HTA and then

- 9 -

to the Bank of New York Mellon for payment to bondholders. Ambac hopes to achieve much the same end by obtaining a declaration that the Commonwealth's continued divergence of these funds pursuant to the Moratorium Laws and Orders and the Fiscal Plan is unconstitutional, preempted under section 303 of PROMESA, and in violation of sections 922(d) and 928(a) of the municipal-bankruptcy code (as incorporated into PROMESA via 48 U.S.C. § 2161(a)).

In Financial Oversight and Management Board for Puerto Rico v. Ad Hoc Group of Puerto Rico Electric Power Authority Bondholders, we held that although section 305 prohibits a Title III court from "directly interfering with the listed powers and properties of [a Commonwealth agency]," it does not bar a Title III court from granting a reprieve from the automatic stay under 11 U.S.C. § 362 to allow another court, pursuant to Commonwealth law, to place a Commonwealth entity into receivership. PREPA, 899 F.3d 13, 19 (1st Cir. 2018). In doing so, we recognized that granting such relief would require a Title III court to "merely stand[] aside" to "allow[] the processes of . . . territorial law to operate in normal course." Id. at 21. Here, by contrast, Ambac's requested relief would require the Title III court itself to direct the Commonwealth's use of its revenues and property in a manner that contravenes the expressed will of the Commonwealth legislature, the Governor of Puerto Rico, and the

- 10 -

Oversight Board.  On its face, the text of section 305 bars the Title III court from granting Ambac such relief absent consent from the Oversight Board or unless the Fiscal Plan so provides. See 48 U.S.C. § 2165.

This conclusion accords with our recent decision in Aurelius Capital Master, Ltd. v. Puerto Rico, in which we held that section 305 bars the Title III court from preventing the Commonwealth from using certain Commonwealth revenues for the payment of general-obligation debt.  919 F.3d 638, 648–49 (1st Cir. 2019).  It also accords with how courts have interpreted the analogous section 904 of the municipal-bankruptcy code.  See Lyda v. City of Detroit (In re City of Detroit), 841 F.3d 684, 696 (6th Cir. 2016) (holding that section 904 prohibits the court overseeing Detroit's bankruptcy from awarding residents an injunction that would have restored water service in the city); Ass'n of Retired Emps. of Stockton v. City of Stockton (In re City of Stockton), 478 B.R. 8, 20–22 (Bankr. E.D. Cal. 2012) (concluding that section 904 precludes enjoining the city from implementing a reduction in retiree health benefits); see generally 6 Collier on Bankruptcy ¶ 904.01 (Richard Levin & Henry J. Sommer eds. 16th ed. 2018) [hereinafter Collier] ("[T]he prohibition of this section is absolute. . . .  The question is . . . whether the order improperly interferes with the political or governmental affairs or property

- 11 -

of the debtor.  If it does, then no matter what authority is used to support it, the order runs afoul of section 904.").

The context in which Congress passed section 904 provides further credence to our reading of section 305.  In Ashton v. Cameron County Water Improvement District, the Supreme Court struck down a predecessor to the modern municipal-bankruptcy statute, reasoning that it allowed a federal bankruptcy court to impermissibly intrude upon the sovereignty of states and their subdivisions.  298 U.S. 513, 531 (1936) ("If obligations of states or their political subdivisions may be subjected to the interference here attempted, they are no longer free to manage their own affairs . . . .").  By including section 904 (and its corollary, 11 U.S.C. § 903, which explicitly reserves power to the states to control municipalities within their territories), Congress intended to give the bankruptcy courts "only enough jurisdiction to provide meaningful assistance to municipalities that require it, not to address the policy matters that such municipalities control."  Lyda, 841 F.3d at 695 (quoting In re Addison Cmty. Hosp. Auth., 175 B.R. 646, 649 (Bankr. E.D. Mich. 1994)); see also 6 Collier ¶ 904.LH.

Notwithstanding the foregoing, Ambac offers four reasons why section 305 should not preclude us from affording it the injunctive and declaratory relief that it seeks in this case.

- 12 -

First, Ambac argues that nothing in section 305 addresses pledged-special-revenue bonds in Title III proceedings. Accordingly, it reasons, sections 922(d) and 928(a) control the treatment and disposition of pledged special revenues in Title III bankruptcy cases, and section 305 therefore poses no bar to the Title III court's ability to grant its requested relief.

Section 922(d) provides that "[n]otwithstanding section 362 of this title and subsection (a) of this section, a petition filed under this chapter does not operate as a stay of application of pledged special revenues . . . to payment of indebtedness secured by such revenues." 11 U.S.C. § 922(d). And section 928(a) states: "Notwithstanding section 552(a) of this title . . . , special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." Id. § 928(a). It is true that section 305, in contrast to these provisions, does not specifically mention "pledged special revenues." But neither does it explicitly reference any other type of municipal debt or substantive form of interference with a debtor's political powers, property, or revenues. Analogously, though a sign might simply state "No Smoking Allowed," no one would reasonably construe such a prohibition as permitting an individual to light up a cigar merely because the sign makes no specific reference to rolled,

- 13 -

tobacco-filled cartridges of the larger, unfiltered variety. Rather, any reasonable reader would conclude that the broad language fairly communicates a reach that plainly encompasses the narrower application; likewise, Ambac's requested relief that would direct the Commonwealth to turn over its property to bondholders falls within the ambit of section 305's sweeping language even if we assume that the funds in question are pledged special revenues within the meaning of sections 922(d) and 928(a).

Of course, if section 305 directly conflicted with sections 922(d) or 928(a) of the municipal bankruptcy code, one might turn to "the ancient canon of interpretation . . . generalia specialibus non derogant (the 'specific governs the general')." Aurelius Inv., LLC v. Puerto Rico, 915 F.3d 838, 851 (1st Cir. 2019). Even then, though, section 305's preface that its terms apply "notwithstanding any power of the court" might well render that rule of construction inapplicable. In any event, there is no real conflict between the sections pertaining to pledged special revenues and section 305. The former two provisions address the relationship between the automatic stay and the application of pledged special revenues to a debt. They say nothing at all about the subject of section 305, i.e., whether the Title III court itself has the power to require a debtor to turn over certain revenues to a creditor. See Assured Guar. Corp. v. Fin. Oversight

- 14 -

& Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 919 F.3d 121, 131 n.12 (1st Cir. 2019).

Second, Ambac alleges that our interpretation of section 305 would "effectively wipe out" sections 922(d) and 928(a) of the municipal bankruptcy code. It argues that these provisions mandate the debtor's continued payment of special revenues pursuant to the terms of the bondholder agreements and that section 922(d) excepts from the automatic stay a creditor's action seeking to enforce that mandate. Our recent decision in Assured Guaranty rejected both of these contentions. See Assured Guar. Corp., 919 F.3d at 127-32. Section 928(a) simply does what it says: It orders that "special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 928(a); see also Assured Guar. Corp., 919 F.3d at 127-29. Section 922(d), in turn, does provide an exception to the automatic stay, but not as broadly as Ambac contends. The automatic stay encompasses a large universe of creditor actions that might affect the debtor, including not just lawsuits and enforcement actions, but also "any post-petition collection activities against the debtor." S. Rep. No. 100-506, at 11 (1988) (emphasis added); see also 11 U.S.C. § 362(a)(3) (barring "any act . . . to exercise control over property of the [debtor]"); 11 U.S.C. § 362(a)(4) (prohibiting

"any act to create, perfect, or enforce any lien against property of the [debtor]"); 11 U.S.C. § 362(a)(6) (proscribing "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the [bankruptcy] case"). This broad universe of stayed actions was understood to include a secured creditor's application of collateral in its possession to the debtor's outstanding debt. See, e.g., 3 Collier ¶ 362.03 ("[I]nnocent conduct such as the cashing of checks received from account debtors of accounts assigned as security may be a technical violation [of section 362(a)(6)]."); id. ("[T]he stay applies to secured creditors in possession of collateral and to collateral in possession of a custodian."); see also S. Rep. No. 100-506, at 11 ("The automatic stay of Bankruptcy Code Section 362 is extremely broad, preventing any post-petition collection activities against the debtor, including application of the debtor's funds held by a secured lender to secure indebtedness." (emphasis added)); Metromedia Fiber Network Servs. v. Lexent, Inc. (In re Metromedia Fiber Network, Inc.), 290 B.R. 487, 493 (Bankr. S.D.N.Y. 2003); In re Reed, 102 B.R. 243, 245 (Bankr. E.D. Okla. 1989). Congress in section 922(d) eliminated any possibility that the stay would prevent the "application of pledged special revenues . . . to payment of indebtedness." 11 U.S.C. § 922(d). But nothing in that language suggests that Congress also excepted the plethora of

- 16 -

other actions to which the automatic stay applies, most obviously and notably suits to compel payment.

Ambac next alleges that section 305 does not prevent the Title III court from granting its requested injunctive and declaratory relief because the Oversight Board consented to such interference by initiating Title III bankruptcy proceedings. But in PREPA we rejected the argument that the mere filing of a Title III petition might constitute such consent, reasoning that to rule otherwise would be to "render section 305 a nullity." PREPA, 899 F.3d at 19. We see no principled reason to reach a different conclusion just because the proposed interference in this case may involve pledged special revenues.

Finally, Ambac argues that its requested declaratory relief is not actually coercive and, thus, would not impermissibly interfere with the governmental affairs or property of HTA and the Commonwealth. However, we declined to endorse this argument in another recent PROMESA case, see Aurelius Capital Masters, Ltd., 919 F.3d at 648, as did the Sixth Circuit in the municipal-bankruptcy setting, see Lyda, 841 F.3d at 696 ("Preliminary or permanent injunctions directing [the City] to stop terminations or to provide water service . . . necessarily interfere[] . . . . A declaration that [the City's] practices are illegal or unconstitutional does the same." (citation omitted) (internal quotation marks omitted)).

At oral argument, counsel for Ambac also raised the possibility that our interpretation of section 305 would raise due process concerns because Ambac would be left without a venue in which to bring its constitutional claims. But nothing in our holding today suggests that Ambac cannot seek traditional stay relief pursuant to 11 U.S.C. § 362 and raise its constitutional and statutory arguments in a separate action. As we explained in PREPA, section 305 "only bar[s] the Title III court itself from directly interfering with the debtor's powers or property." 899 F.3d at 21. It does not, however, impose any such restraint on another court.

Accordingly, we hold that the Title III court lacks the authority to grant the declaratory and injunctive relief that Ambac seeks in this case.[4]

### III.

For the foregoing reasons, the judgment is affirmed.

---

[4] In its First Amended Complaint, Ambac alleges that the Bank of New York Mellon has not applied approximately $69 million in funds that it is holding in trust for HTA bondholders, citing AAFAF's letter directing it to retain these funds. And in one cursory footnote in its brief, Ambac suggests that section 305 might not bar the Title III court from ordering the disbursement of pledged special revenues that are already in the hands of the fiscal agent. Ambac, however, does nothing further to develop this argument, so we treat it as waived and we do not consider it in this appeal. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").