# United States Court of Appeals
## For the First Circuit

———————————

Nos. 18-1165, 18-1166

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF
PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS &
TRANSPORTATION AUTHORITY,

Debtors.

———————————

ASSURED GUARANTY CORPORATION; ASSURED GUARANTY MUNICIPAL
CORPORATION; FINANCIAL GUARANTY INSURANCE COMPANY; NATIONAL
PUBLIC FINANCE GUARANTEE CORPORATION,

Plaintiffs, Appellants,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,
AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO;
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO;
PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AURTHORITY;
THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,
AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS & TRANSPORTATION
AUTHORITY; RICARDO ROSSELLÓ-NEVARES; GERARDO JOSÉ PORTELA-FRANCO;
CARLOS CONTRERAS-APONTE; JOSÉ IVÁN MARRERO-ROSADO;
RAÚL MALDONADO-GAUTIER; NATALIE A. JARESKO,

Defendants, Appellees,

JOSÉ B. CARRIÓN III; ANDREW G. BRIGGS; CARLOS M. GARCÍA;
ARTHUR J. GONZÁLEZ; JOSÉ R. GONZÁLEZ; ANA J. MATOSANTOS;
DAVID A. SKEEL, JR.; CHRISTIAN SOBRINO,

Defendants.

———————————

**ORDER OF COURT**
<u>Entered</u>: July 31, 2019


The petition for rehearing having been denied by the panel of judges who decided the case, and the petition for rehearing en banc having been submitted to the active judges of this court and a majority of the judges not having voted that the case be heard en banc, it is ordered that the petition for rehearing and the petition for rehearing en banc be <u>denied</u>.

**KAYATTA**, **<u>Circuit Judge</u>, with whom HOWARD, <u>Chief Judge</u>, TORRUELLA, <u>Circuit Judge</u>, and THOMPSON, <u>Circuit Judge</u>, join, statement on denial of rehearing en banc.** The central issue in this case is whether the creditor-bondholders, without first obtaining permission from the Title III court, may commence a judicial proceeding against a Commonwealth debtor to obtain a court order restoring the flow of post-petition pledged special revenues from the debtor. Two panels of this court recently held that sections 922 and 928 of the municipal bankruptcy code do not afford creditors a shortcut to bypass the requirement of obtaining traditional stay relief in order to bring such an enforcement action. <u>See</u> <u>Ambac Assurance Corp.</u> v. <u>Commonwealth of Puerto Rico</u> (<u>In re Fin. Oversight & Mgmt. Bd. for P.R.</u>), 927 F.3d 597, 604–05 (1st Cir. 2019); <u>Assured Guar. Corp.</u> v. <u>Fin. Oversight & Mgmt. Bd. for P.R.</u> (<u>In re Fin. Oversight & Mgmt. Bd. for P.R.</u>), 919 F.3d 121, 127–32 (1st Cir. 2019). Because I believe that the dissent's objection to our denial of the creditors' petition for rehearing en banc is unsupported by the text of sections 922 and 928 and misconstrues the legislative context and history accompanying those provisions, I elaborate on my support for the panel's holding and for the denial of the petition.

**I.**

The creditors' desire to commence a proceeding without permission from the Title III court implicates section 362(a) of the bankruptcy code, which automatically stays a broad variety of creditor actions against the debtor or the debtor's property upon the debtor's filing of a bankruptcy petition. <u>See generally</u> 11 U.S.C. § 362(a). One of the creditor actions that section 362(a) stays is the "commencement . . . of a judicial . . . proceeding against the debtor that . . . could have been commenced before the commencement of the [bankruptcy] case . . . or to recover a claim against the debtor that arose before the commencement of the [bankruptcy] case." <u>Id.</u> § 362(a)(1). Under other subsections, the stay also applies to many creditor actions that fall short of commencing a judicial proceeding. These include, in relevant part, "any act . . . to exercise control over property of the [debtor]," <u>id.</u> § 362(a)(3); <u>see also</u> <u>id.</u> § 902(1) (stating that "property of the estate" when used in the municipal bankruptcy context "means property of the debtor"), "any act to . . . enforce any lien against property of the [debtor]," <u>id.</u> § 362(a)(4), "any act to . . . enforce against property of the debtor any lien to the extent that such lien secures a lien that arose before

---

[*] Judge Barron is recused and did not participate in this matter.

the commencement of the [bankruptcy] case," id. § 362(a)(5), and "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the [bankruptcy] case," id. § 362(a)(6).

The leading treatise on bankruptcy law recognizes the breadth of actions encompassed by the collective subsections of section 362(a), particularly in the municipal bankruptcy context. See 3 Collier on Bankruptcy ¶ 362.03 (Richard Levin & Henry J. Sommer eds. 16th ed. 2018) [hereinafter Collier] ("[I]nnocent conduct such as the cashing of checks received from account debtors of accounts assigned as security may be a technical violation [of section 362(a)(6)]."); id. ("[T]he stay applies to secured creditors in possession of collateral and to collateral in possession of a custodian."); see also 6 Collier, supra, ¶ 901.04 ("The applicability of section 362 to municipal debt adjustment cases is a continuation of prior law. However, the protection afforded by section 362 is substantially broader for the debtor . . . ."). The case law also acknowledges the breadth of creditor conduct stayed by section 362(a). See, e.g., Thompson v. Gen. Motors Corp., 566 F.3d 699, 703 (7th Cir. 2009) (holding that a secured creditor's passive retention of collateral after the filing of a bankruptcy petition violates section 362(a)(3)); Lex Claims, LLC v. Fin. Oversight & Mgmt. Bd., 853 F.3d 548, 551–52 (1st Cir. 2017) (citing Thompson with approval); Metromedia Fiber Network Servs. v. Lexent, Inc. (In re Metromedia Fiber Network, Inc.), 290 B.R. 487, 493 (Bankr. S.D.N.Y. 2003) (observing that a secured creditor's failure to remit collateral to the debtor constitutes an exercise of control over the debtor's property); In re Reed, 102 B.R. 243, 245 (Bankr. E.D. Okla. 1989) (noting that a secured creditor's sale of collateral in its possession violates the automatic stay provision).[1]

More importantly, the drafters of what became section 922(d) expressed concern about the broad reach of the automatic stay as applied to what the municipal bankruptcy code labels "special revenues." See 11 U.S.C. § 902(2) (defining "special revenues"). Under many municipal bond arrangements, like those at issue in this case, the debtor turns over funds to a fiscal agent, or trustee, who then turns over the funds to the creditor, who in turn applies the funds to outstanding debt. But the breadth of the automatic stay poses a problem for this general scheme. As the Senate Report accompanying the 1988 amendments to the municipal bankruptcy code observes, "[t]he automatic stay of Bankruptcy Code Section 362 is extremely broad, preventing any post-petition collection activities against the debtor, including application of the debtor's funds held by a secured lender to secure indebtedness." S. Rep. No. 100-506, at 11 (1988) (emphasis added). New section 922(d), enacted in the wake of that Senate Report, addressed this concern directly. It states: "Notwithstanding [the automatic stay], a petition filed under this chapter does not operate as a stay of application of pledged special revenues in a manner consistent with section [928] of this title to payment of indebtedness secured by such revenues." 11 U.S.C. § 922(d).

---

[1] Citing no contrary authority, the dissent says that the "application of pledged revenues that a bondholder already holds is not and never was clearly barred by the automatic stay." Given the foregoing case law and the very broad language of the stay, it is hard to see much lack of clarity here. But even if we were to assume that the law was then unclear as to the reach of the automatic stay, the panel's reading of section 922(d) would still function to clarify the law in a manner contrary to the existing case law, which would preclude one from declaring the provision superfluous.

There is some ambiguity in the text of section 922(d). The passive syntax fails to indicate who (e.g., creditor, debtor, or fiscal agent) it is that the provision permits to apply pledged special revenues to the debt. And, I suppose, one might also wonder what exactly "application" means.

To answer those questions, one might most easily look at that part of the Senate Report that specifically addresses section 922, quoted above. That portion of the Report expressly and unambiguously refers to the application of pledged special revenues already in the hands of the secured creditor. And, if one views the fiscal agent or trustee as an agent of the creditor in transmitting funds when due, one might find in section 922(d) permission for such a transfer by the fiscal agent as well. This latter view finds support in another portion of the Senate Report, which explicitly clarifies that section 922(d) makes the automatic stay inapplicable to the bond trustee's application of funds to the payment of outstanding debt. See S. Rep. No. 100-506, at 13 ("In this context, 'pledged revenues' includes funds in the possession of the bond trustee . . . ."). This reading would not somehow render section 922(d) superfluous or of no effect. Rather, it would clearly permit exactly what the Senate Report said Congress was concerned about in referring to the "application of the debtor's funds held by a secured lender to secure indebtedness." Id. at 11.

The foregoing notwithstanding, the bondholders and the dissent point to this ambiguity in section 922(d) as license to hunt the legislative record for bigger game: a conclusion that section 922(d) was intended to allow creditors to commence, without prior permission from the Title III court, a judicial proceeding to secure a court order compelling the debtor to continue making payments in accordance with the bondholder resolutions after the filing of a Title III petition. I see two flaws in this hunt through the legislative record.

First, its aim exceeds the license afforded by the relevant ambiguity in section 922(d). If a hypothetical statutory provision were deemed to be ambiguous because it refers to "motor vehicles operated on public roads," we might look to the pertinent legislative history to see if "electric bikes" were in mind when Congress drafted that provision. But we would not seize upon language in the legislative history to hold that "motor vehicles" includes "kayaks." See 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 259 n.6 (2009) ("[R]eading the legislative history in the manner suggested by respondents would create a direct conflict with the statutory text . . . . In such a contest, the text must prevail."); Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005) ("Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms."). Similarly, while section 922(d) may be ambiguous as to who it allows to apply funds, it is clear that it only grants permission to act; i.e., it allows some actor to apply funds "notwithstanding" the automatic stay. 11 U.S.C. § 922(d). Nothing in the language remotely suggests that it compels anyone to make such an application. So, if, as the dissent maintains, this case is really about "whether a debtor . . . must continue to pay pledged special revenues," nothing in the permission granted by section 922(d) could possibly provide an answer that helps the bondholders.[2]

---

[2] For this reason, I read the statement in Assured Guaranty that section 922(d) is "unambiguous," 919 F.3d at 132, as correctly saying that the provision contains no relevant ambiguity that would invite the reading proffered by the bondholders.

- 4 -

Second, whatever "application" may mean, it cannot reasonably be read as "commencing a judicial proceeding" to compel payment. The dissent points to two contemporaneous dictionary definitions of the term "application" to demonstrate the term's ambiguity. But even the dissent's proffered definition of "application" -- "[a]ppropriation of a payment to some particular debt," Application, Black's Law Dictionary (6th ed. 1990) -- could not reasonably encompass the instigation of an enforcement action against a debtor.

As subsection (a)(1) of the automatic stay provision demonstrates, Congress knew how to refer to the filing of a lawsuit against a debtor, and it did so in straightforward terms in that instance. See 11 U.S.C. § 362(a)(1) (staying "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the [bankruptcy] case"). Had Congress wanted to exempt from the stay a creditor's judicial action to enforce the terms of a bondholder agreement, it would have been exceedingly easy to do so by invoking the language used in subsection (a)(1). See Lozano v. Montoya Alvarez, 572 U.S. 1, 16 (2014) (observing that when the drafters of legislation did not use "obvious alternative" language, "the natural implication is that they did not intend" that alternative). But Congress did not do so. Further, if one looks at all seven subsections of section 362(a) and asks which one covers the "application" of funds to a debt, one would never pick subsection (1). It reasonably follows that 922(d) leaves that subsection undisturbed.

Nor does section 922(d)'s reference to section 928 require a contrary result. Section 922(d) commands that "application of pledged special revenues" be done in a manner "consistent" with section 928 -- which in turn provides that liens on special revenues "shall be subject to the necessary operating expenses" of the project or system. See 11 U.S.C. §§ 922(d), 928(b). The dissent contends that this cross-reference to 928(b) means that "application" must refer to something more than funds already in the hands of a creditor. Not so. In a non-municipal bankruptcy proceeding, a bankrupt debtor (or its trustee) can move the bankruptcy court to compel a third party in possession of estate property to turn over that property to the debtor. See 11 U.S.C. § 542. Similarly, in the municipal bankruptcy context, the Senate Report makes evident that the bankruptcy court "retain[s] the power to enjoin application of proceeds . . . upon a specific showing of need, for example, where a secured creditor was about to apply proceeds of a gross revenue pledge in a manner inconsistent with policies of the proposed new section." S. Rep. No. 100-506, at 11; see also 6 Collier, supra, ¶ 922.05 n.22 ("[T]he bankruptcy court has ample authority under its general equitable powers to accomplish what the statute appears to contemplate, namely, use of pledged special revenues when necessary for the continued operation of the project or system from which the revenues are derived."). Thus, in ordinary course, section 922(d) enables a creditor to apply pledged special revenues in its possession to outstanding debt unless the Title III or bankruptcy court enjoins the creditor from doing so upon a showing by the debtor of a need to pay necessary operating expenses.

## II.

The creditors and the dissent also suggest that section 928(a) of the municipal bankruptcy code might be read to accomplish what section 922(d) clearly does not. But section 928(a) bears no relevant ambiguity. It simply means what it says: The provision orders that "special revenues acquired by the debtor after the commencement of the case shall remain

subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 928(a). In other words, post-petition pledged special revenues are still subject to the pre-petition lien created by the bondholder agreements despite the filing of a bankruptcy petition. Contrary to the dissent's view, section 928(a) suggests nothing about the enforcement of a creditor's lien on pledged special revenues. It merely preserves a secured creditor's right to those post-petition funds throughout the bankruptcy proceeding, and the creditor can then assert its right to those funds during the plan-of-adjustment confirmation phase, see generally 11 U.S.C. § 943(a) (granting standing to object to a plan of adjustment to "special tax payer[s]"); id. § 902(3) (defining "special tax payer"); 6 Collier, supra, ¶ 943.02 (explaining that "creditors whose claims are affected by the plan of adjustment" have standing to object), or earlier by requesting stay relief "for cause," such as "the lack of adequate protection" of that collateral, 11 U.S.C. § 362(d)(1). Nor does subsection 928(b) -- which, again, provides that "any such lien on special revenues . . . derived from a project or system shall be subject to the necessary operating expenses of such project or system," id. § 928(b) -- compel a different reading. That subsection merely limits the pool of post-petition funds to which a creditor has an interest; in practical terms, this means a creditor cannot object -- through a request for stay relief or at the plan-confirmation phase -- to the debtor's use of post-petition pledged special revenues for "necessary operating expenses."

The Senate Report accompanying the 1988 amendments makes this explicit. As that Report explains, "[new] Section [928], along with the definition of special revenues in Section 902(3), protects the lien on revenues. . . . It is intended to negate Section 552(a) in the municipal context and to go no further. In other words, it is not intended to create new rights . . . ." S. Rep. No. 100-506, at 12 (emphasis added). Section 552(a) of the bankruptcy code, incorporated from the non-municipal context, provides that "property acquired . . . by the debtor after the commencement of [bankruptcy] is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a). As the Senate Report explains, this provision created a slew of potential problems in the municipal context. Among those problems included the termination of creditors' security interests in future special revenues. This, in turn, made it possible that (1) revenue bonds would be converted into general obligation debt upon the filing of bankruptcy; (2) future streams of special revenues would be made accessible to general creditors; (3) municipal debt limits would be exceeded; and (4) municipalities that elected to continue paying bondholders would face difficulty in obtaining plan confirmation. See S. Rep. No. 100-506, at 5–9. As the Senate Report makes evident, section 928(a) simply reverses the problems created by section 552, but it does nothing more.

## III.

The foregoing should be enough to end the debate. The ambiguity of the statutory text is simply not broad enough to allow one to read these sections as allowing the bondholders to commence a collection action without first obtaining leave of court. In resisting this conclusion, the dissent and the creditors also commit the further error of badly misconstruing the context and legislative history accompanying the 1988 amendments in support of their reading of sections 922(d) and 928(a).

As evidence that these provisions should be read to allow a creditor to bring a post-petition enforcement action against a debtor to enforce the terms of a bondholder agreement, the

dissent points to one portion of the Senate Report that reads: "[T]he amendments insure that revenue bondholders receive the benefit of their bargain with the municipal issuer, namely, they will have unimpaired rights to the project revenue pledged to them." Id. at 12. When read in context, however, it is apparent that this statement was made in reference to the new section 928(a) and its elimination of the problems created by section 552 of the bankruptcy code, discussed above. See id. As I have already explained, section 928(a) does ensure that creditors receive the benefit of their bargain by securing their liens on future streams of pledged special revenues (and their right to protect their property interests in those revenues at the appropriate time and through the appropriate channels) despite the debtor's bankruptcy filing. Of course, it is true that a debtor's decision to discontinue making payments and to divert its revenues elsewhere might impair the security created by such liens. The risk that a debtor will misuse collateral exists in every bankruptcy case, municipal or otherwise. But that possibility gives us no license to rewrite section 922(d) to authorize the commencement of a judicial proceeding against the debtor without leave of the Title III or bankruptcy court. Rather, in such an event, the statute and the case law direct the creditor to seek and obtain relief from the stay to protect its interests. See 11 U.S.C. § 362(d); infra Part IV.

The dissent also points to the Senate Report's assertion that the "[r]easonable assurance of timely payment is essential to the orderly marketing of municipal bonds and notes and continued municipal financing." S. Rep. No. 100-506, at 21. Unlike the previous quote, this excerpt does refer to the new section 922(d). But in reading this passage to suggest that section 922(d) mandates the continued payment of pledged special revenues or to allow an enforcement action to achieve the same end, the dissent ignores the Senate's use of the qualifier "reasonable" before "assurance." More importantly, it ignores the larger context in which Congress passed the 1988 amendments. Both the Senate and House Reports note examples of municipalities electing to continue making payments to bondholders after filing for bankruptcy -- despite the practical difficulties created by section 552 of the bankruptcy code discussed above -- to ensure their creditworthiness. See id. at 6 (providing examples, including the San Jose School District and Medley, Florida); H.R. Rep. No. 100-1011, at 3 (1988) (discussing the San Jose School District); see also S. Rep. No. 100-506, at 25 ("[S]ection 552 may prevent troubled municipalities from giving the kind of assurances that are necessary for continued financing."). Along with section 928(a), section 922(d) facilitates voluntary payments from a municipal debtor -- and therefore a municipality's ability to give "reasonable assurance of timely payment" -- to a creditor by allowing a creditor in receipt of pledged special revenues to apply those revenues to outstanding debt.

The Reports' references to "payments," S. Rep. No. 100-506, at 13; H.R. Rep. No. 100-1011, at 7, and the Senate Report's subsequent statement that "[w]here a pledge of revenues survives under Section [928], it would be needlessly disruptive to financial markets for the effectuation of the pledge to be frustrated by an automatic stay," S. Rep. No. 100-506, at 21, must be understood in a similar light. And the dissent ignores the immediately succeeding sentence from the Senate Report, which states: "Further, the use of an automatic stay may be contrary to Section 904 and interfere with the government, affairs and the municipality's use or enjoyment of income producing property." Id. at 21. The reference to section 904 of the municipal bankruptcy code would make no sense under the preferred interpretation of section 922 tendered by the bondholders and the dissent.

## IV.

I add three brief final thoughts. First, I note that the dissent's arguments regarding section 305 of PROMESA are adequately addressed in our recent opinion in <u>Ambac Assurance Corp.</u>, 927 F.3d at 602–05. I do not rehash those arguments here.

Second, stay relief under section 362(d) of the bankruptcy code is not the paper tiger that the dissent makes it out to be. That section affords the bankruptcy or Title III court no discretion to decline a request for stay relief upon a showing of a "lack of adequate protection of an interest in property." <u>See</u> 11 U.S.C. § 362(d)(1) (stating that a bankruptcy court "<u>shall</u> grant relief from the stay" for "lack of adequate protection of an interest in property" (emphasis added)); <u>see generally</u> <u>Fin. Oversight & Mgmt. Bd. for P.R.</u> v. <u>Ad Hoc Group of PREPA Bondholders</u> (<u>In re Fin. Oversight & Mgmt. Bd. for P.R.</u>), 899 F.3d 13, 20 (1st Cir. 2018) ("[S]ection 362(d)(1) guards against the possibility that the automatic stay could deprive a creditor of its property interest by precluding the creditor from exercising any rights it possesses to protect that interest from destruction.").

Finally, I note that the application of the automatic stay provision to the bondholders' claims against the Commonwealth raises no new issues of constitutional dimension that would warrant a different reading of sections 922 and 928. Courts, including the U.S. Supreme Court, have time and again affirmed the constitutionality of section 362 of the bankruptcy code against Fifth Amendment Takings Clause claims. <u>See, e.g.</u>, <u>Wright</u> v. <u>Union Cent. Life Ins. Co.</u>, 311 U.S. 273, 278 (1940) ("Safeguards were provided to protect the rights of secured creditors, throughout the proceedings, to the extent of the value of the property. There is no constitutional claim of the creditor to more than that." (citations omitted)); <u>United Sav. Ass'ns of Tex.</u> v. <u>Timbers of Inwood Forest Assocs., Ltd.</u> (<u>In re Timbers of Inwood Forest Assocs., Ltd.</u>), 793 F.2d 1380, 1390 (5th Cir. 1986) ("In general, the Fifth Amendment requires only that the value of the secured position of a creditor be maintained during the stay."); <u>Lend Lease</u> v. <u>Briggs Transp. Co.</u> (<u>In re Briggs Transp. Co.</u>), 780 F.2d 1339, 1342 (8th Cir. 1985) ("The bankruptcy code's automatic stay . . . causes only a temporary delay of a creditor's right to enforce its lien on the collateral. . . . [The] suspension of the right to enforce a lien is within Congress's constitutional bankruptcy powers." (citations omitted)).

And as for the dissent's invocation of the Tenth Amendment, the Supreme Court -- more than eighty years ago and before section 922(d) even existed -- upheld the municipal bankruptcy code against such an attack. <u>See</u> <u>United States</u> v. <u>Bekins</u>, 304 U.S. 27, 51–52 (1938) ("The statute is carefully drawn so as not to impinge upon the sovereignty of the State. The State retains control of its fiscal affairs.").

## V.

For the above-stated reasons, I support the denial of the creditors' petition for rehearing en banc.

**-- Dissenting Opinion Follows --**

- 8 -

**LYNCH**, <u>Circuit Judge</u>, **dissenting from the denial of rehearing en banc**.  With the greatest respect for my colleagues, I dissent.  I have grave doubts about the panel's holding and the analysis of both the panel and the concurrence as to the denial of en banc, and I believe that further review is warranted, if not by this court, then by the Supreme Court.  At its core, this case is about whether, under municipal bankruptcy law, the government debtor must continue to pay pledged special revenues to special revenue bondholders during a bankruptcy proceeding (or, put another way, whether a debtor can elect not to pay, and order a fiscal agent not to pay, special revenue bondholders despite the indenture).  This issue is of extraordinary importance: it goes well beyond the Title III proceedings in the Commonwealth as to both potential municipal and state defaults, affects special revenue bonds nationwide, and has Constitutional implications.

The petitioners are insurers ("the Insurers") of Puerto Rico Highway and Transportation Authority ("PRHTA") special revenue bonds secured by liens on pledged special revenues.  They allege the Commonwealth has diverted these special revenues to uses not authorized by the terms of the bonds.  Specifically, the Commonwealth stopped the making of payments from the reserve accounts associated with the bonds, taking the position that automatic stay provisions incorporated from the Bankruptcy Code into the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") barred such special revenue payments.  The Commonwealth, by legislation, also ordered the fiscal agent for the special revenue bonds, the Bank of New York Mellon, "to halt payments to [PR]HTA bondholders."[3]  <u>Ambac Assurance Corp.</u> v. <u>Puerto Rico</u> (<u>In re Fin. Oversight & Mgmt. Bd. for P.R.</u>), 927 F.3d 597, 601 (1st Cir. 2019).  The petitioners sought relief, alleging that: under several provisions of the Bankruptcy Code, <u>see</u> 11 U.S.C. §§ 922(d), 928, and U.S. Constitutional requirements, the filing of the Title III petition does not operate as a stay against the application of pledged special revenues to these special revenue bondholders; such payments are required during the pendency of the Title III proceeding; and the Commonwealth's actions effectively have nullified their ability to collect the pledged revenues.  It is estimated that the sums at issue are about $2.6 billion of the $4.5 billion in outstanding PRHTA bonds.

The panel opinion, from which further review is sought, holds that under Sections 362, 922(d), and 928 of the Bankruptcy Code, mandatory payments to PRHTA special revenue bondholders from the reserve accounts, and actions by those bondholders or insurers to enforce their liens on such revenues, are automatically stayed.  <u>Assured Guaranty Corp.</u> v. <u>Fin. Oversight & Mgmt. Bd. for P.R.</u> (<u>In re Fin. Oversight & Mgmt. Bd. for P.R.</u>), 919 F.3d 121, 132-33 (1st Cir. 2019).  As a result, during the Title III proceeding, these bondholders cannot receive payment of special revenues promised to them at issuance unless the Commonwealth <u>voluntarily</u> makes such payment.[4]  <u>Id.</u>  One other option, which is not discussed by the opinion, is for the special revenue

---

[3]  The recent panel opinion in <u>Ambac Assurance Corp.</u> v. <u>Puerto Rico</u> (<u>In re Financial Oversight & Management Board for P.R.</u>), 927 F.3d 597 (1st Cir. 2019), builds off of <u>Assured Guaranty Corp.</u> v. <u>Financial Oversight & Management Board for P.R.</u> (<u>In re Financial Oversight & Management Board for P.R.</u>), 919 F.3d 121 (1st Cir. 2019), in part, and I disagree with aspects of it as well.

[4]  I do not address the issue of ownership of the reserve accounts, because, as the panel opinion correctly states, "the Insurers have failed to develop on appeal any argument on the PRHTA bondholders' property interest in the Reserve Account funds."  <u>Assured Guaranty</u>, 919

bondholders (or the subrogated insurers) to petition the district court to lift the stay as to their interests; in my view, it is not likely that Congress intended to impose such a burden on those bondholders, preferring instead to make the automatic stay inapplicable to start with.

I disagree with the panel opinion that the statutory exceptions to the stay are limited to giving the debtor the voluntary option of payment and disagree that the text is unambiguous. Any interpretation of the text of Section 922(d) and Section 928 of the Bankruptcy Code[5] requires resort to both context and legislative history. That required analysis supports the Insurers' position: because payment of the special revenues pursuant to the relevant bond resolution(s) is mandatory

---

F.3d at 127 n.6. I also do not address the Insurers' argument that they should prevail on the text of the stay exceptions alone because I view the text as ambiguous.

     [5]       Section 922 states, in relevant part:
(a)  A petition filed under this chapter operates as a stay, in addition to the stay provided by section 362 of this title, applicable to all entities, of --

> (1)  the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against an officer or inhabitant of the debtor that seeks to enforce a claim against the debtor; and
> (2)  the enforcement of a lien on or arising out of taxes or assessments owed to the debtor.

. . .
(d)  Notwithstanding section 362 of this title and subsection (a) of this section, a petition filed under this chapter does not operate as a stay of application of pledged special revenues in a manner consistent with section 92[8] of this title to payment of indebtedness secured by such revenues.

11 U.S.C. § 922.  Section 922 refers to "section 927" rather than 928, but the panel opinion rightly notes that this appears a scrivener's error; this has been widely accepted, including by the parties in this case.  Assured Guaranty, 919 F.3d at 130 n.10.

           Section 928 provides:

(a)  Notwithstanding section 552(a) of this title and subject to subsection (b) of this section, special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.
(b)  Any such lien on special revenues, other than municipal betterment assessments, derived from a project or system shall be subject to the necessary operating expenses of such project or system, as the case may be.

11 U.S.C. § 928.

during the bankruptcy proceeding (after deducting "necessary operating expenses" per Section 928(b)), bondholders can bring an action to enforce their liens if necessary without first having to seek relief from the automatic stay. The panel opinion, which stints on the analysis required by rules of construction, also conflicts with the persuasive view in In re Jefferson County, 474 B.R. 228 (Bankr. N.D. Ala. 2012), that "[t]he structure and intent of what Congress enacted by its 1988 amendments to chapter 9 [of the Bankruptcy Code] was to provide a mechanism whereby the pledged special revenues would continue to be paid uninterrupted," id. at 274.

My understanding of the statutes essentially preserves the status quo before the filing, and the benefit of the bargain between the issuer and bondholder, as to these special revenues; provides assurance for the massive and important municipal bond market; and supports the operation of local governments. Nothing in substantive municipal bankruptcy law excuses the debtor or any of its intermediaries from continued payment of special revenues, and the automatic stay does not apply to these special revenues due to the exceptions created by Sections 922 and 928.

I.

The procedural history and basic facts of this case are ably described in the panel opinion. See Assured Guaranty, 919 F.3d at 124-27. Before explaining why I disagree with the panel's analysis, however, some background on the statutory arrangement is necessary.

Title III of PROMESA incorporates by reference numerous provisions from the Bankruptcy Code. See 48 U.S.C. § 2161. These include the automatic stay provisions at 11 U.S.C. §§ 362(a)[6] and 922 (and the express exceptions in those provisions), and the provision regarding the "[p]ost petition effect of security interest" at 11 U.S.C. § 928.

---

[6] The automatic stay provision at Section 362 states, in relevant part:
(a) Except as provided in subsection (b) of this section, a petition filed . . . operates as a stay, applicable to all entities, of --
(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;
(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
(4) any act to create, perfect, or enforce any lien against property of the estate;

- 11 -

Importantly, Section 922(d) and Section 928 were added to the Bankruptcy Code as part of the 1988 amendments to Chapter 9 of the Bankruptcy Code, to solve certain problems created by prior law in the area of municipal bankruptcy. See Pub. L. No. 100-597, 102 Stat. 3028, 3029 (codified at scattered sections of 11 U.S.C.). Here, I identify certain problems Congress was trying to solve, in the municipal bond market and in municipal bankruptcy, by enacting the 1988 amendments.

Before the 1988 amendments, concerns had been brought to Congress about the Bankruptcy Code's application to municipal bankruptcy, and the problems that prior amendments had caused. Chapter 9, which addresses municipal bankruptcy, had been substantially amended in 1976. See Act to Amend Chapter IX of the Bankruptcy Act, Pub. L. No. 94-260, 90 Stat. 315 (1976). It was amended again in 1978. See The Bankruptcy Reform Act of 1978, Pub. L. No. 95–598, 92 Stat. 2549. The latter revision problematically incorporated by reference a number of concepts from the law of corporate bankruptcy into municipal bankruptcy law.[7] Id. § 901(a); 92 Stat. at 2621.

In making the revisions ten years later, Congress stated, "[b]ecause the worlds of commercial finance and municipal finance are so diverse, the simple incorporation by reference of the 1978 commercial finance concepts into the municipal bankruptcy arena simply did not work." See S. Rep. No. 100-506, at 3 (1988). The House Report to the 1988 amendments pointed out that a municipality is different than other debtors in bankruptcy, because "a municipality cannot simply go out of business" and "must continue to provide its residents with essential services." H.R. Rep. No. 100-1011, at 2 (1988). And so Chapter 9 "is designed just for municipalities, to keep them in existence." Id. Accordingly, both the Senate and House Reports for the 1988 amendments stated a need to fix "inconsistencies between bankruptcy law and principles of municipal finance." Id. at 3; accord S. Rep. No. 100-506, at 1.

Congress had been urged to make these amendments by a range of officials and groups including the Vice Mayor of San Jose, California (on behalf of the National League of Cities), the National Bankruptcy Conference, and the National Association of Bond Lawyers. H.R. Rep. No. 100-1011, at 1. In response, Congress then articulated several specific concerns stemming from the commercial concepts that had been incorporated into municipal bankruptcy law. One of the concerns was that, without the amendments, Section 552(b) of the Bankruptcy Code might "effectively destroy the distinction between general obligation debt and limited

_____

(5)      any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6)      any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title . . . .

11 U.S.C § 362(a).

[7]      A more minor revision to municipal bankruptcy law was made by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333.

revenue obligation debt," in part by allowing "general creditors of the municipality to seek payment from the pledged revenues."  S. Rep. No. 100-506, at 5.

Revenue bonds are bonds "issued to finance projects or programs . . . [such as] toll roads, water systems, sports and convention centers, health care facilities, sewer and waste water treatment facilities, power generating facilities, waste disposal facilities, or low and moderate income housing programs," and are paid through pledged revenue from the project or system.  S. Rep. No. 100-506, at 4.  By contrast, general obligation bonds are those "for which the general taxing power of the issuer is pledged to repay the bonds."  Id. at 4-5.  There are clear, well-delineated contrasts between these types of bonds.  For revenue bonds, "bondholders cannot look to any other assets of the municipality for repayment," H.R. Rep. No. 100-1011, at 4, meaning that "the general taxpayers are usually not committed to repaying the [revenue] bonds or funding operational deficits through general tax revenues," S. Rep. No. 100-506, at 5.  Accordingly, the rates on the different types of bonds can be different for the same municipality, because revenue bonds generally depend on the prospects of the project or system itself rather than the general creditworthiness of the municipality.  So, the conversion of one type of bond into the other creates an obvious problem.

The Senate Report also stated the "real concern that revenues dedicated to the repayment of municipal and local obligations will be diverted to other purposes once a municipality or local government enter[s] bankruptcy."  S. Rep. No. 100-506, at 5.  That is exactly what happened here.  The Report expressed concern about the possible unconstitutionality of invalidating such a lien under Section 552(a).[8]  In doing so, it cited two Supreme Court cases, Ashton v. Cameron County Water Improvement District No. 1, 298 U.S. 513 (1936), and United States v. Bekins, 304 U.S. 27 (1938).  S. Rep. No. 100-506, at 6.

Congress articulated yet another concern about the operation of the automatic stay provision at Section 362 as to special revenue bonds.  The Senate Report explained:

> The automatic stay of Bankruptcy Code Section 362 is extremely broad, preventing any post-petition collection activities against the debtor, including application of the debtor's funds held by a secured lender to secure indebtedness.
>
> This provision is overly broad in Chapter 9, requiring the delay and expense arising from a request for relief from the automatic stay to

---

[8]  Section 552(a) provides that "[e]xcept as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."  11 U.S.C. § 552(a).

Section 552(a) in the municipal context," by "remov[ing]" the limitation of rights formerly allowed by Section 552(a) in the municipal revenue bond context (i.e., the termination of a pre-petition lien on pledged special revenues, contrary to some "state law and constitutional provisions").  S. Rep. No. 100-506, at 12-13.

> accomplish what many state [statutes] mandate: the application of
> pledged revenues after payment of operating expenses to the
> payment of secured bonds. The automatic stay should specifically
> be inapplicable to application of such revenues.
>
> The Bankruptcy Court could retain the power to enjoin application
> of proceeds, however, upon a specific showing of need, for example,
> where a secured creditor was about to apply proceeds of a gross
> revenue pledge in a matter inconsistent with policies of the proposed
> new section.

Id. at 11 (emphasis and spacing added). Put simply, the prior law, as to the automatic stay, caused a problem in subjecting the special revenue payments made by municipalities to the bondholders, to the automatic stay. Congress wanted to solve that problem with the 1988 amendments. As to the solution, Congress expressly rejected forcing the bondholder to make a "request for relief" (that is, a lift-stay motion) from the automatic stay. Further, it wanted to keep the burden on the debtor to justify non-payment, and not on the special revenue bondholder: the Report continued that the debtor could seek to enjoin the "application of pledged revenues . . . to the payment of secured bonds" upon a "specific showing of need" based on a creditor's intent "to apply proceeds of a gross revenue pledge in a matter inconsistent with policies of the proposed new section."[9] Id. That is clearly not the situation here; there is no assertion that the Insurers were planning to apply special revenues in a way inconsistent with the statute.

In two consistent reports, Congress explained the problems it was trying to solve with the 1988 amendments, and I now turn to the text of the relevant statutes.

II.

A.      The Statutory Text Requires Resort to Context and Legislative History

The panel opinion holds that the language in each of Sections 922(d) and 928(a) is unambiguous, and that therefore the court did not need to inquire further. Assured Guaranty, 919 F.3d at 129 ("Because the language of the statute is unambiguous . . . we find it unnecessary to turn to the legislative history."); id. at 132 ("[B]ecause we find the statute's language unambiguous, there is no need to rely on legislative history."). I disagree that the analysis can be so truncated here.

I agree, of course, that "[i]n statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." Food Mktg. Inst. v. Argus Leader Media, 139 S. Ct. 2356, 2364 (2019). And so I begin there. In doing so, I remain mindful that "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the

---

        [9]      Taking the concurrence's assertion (whether accurate or not) that a lift-stay motion for cause is easily done, the same logic would extend to a municipal debtor's action to enjoin application of proceeds based on a "specific showing of need." S. Rep. No. 100-506, at 11.

broader context of the statute as a whole."[10] Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997). Statutory context is important, as always, because we have a "duty to construe statutes, not isolated provisions," and so I pay careful attention to context in analyzing the provisions at issue. Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson, 559 U.S. 280, 290 (2010) (quoting Gustafson v. Alloyd Co., 513 U.S. 561, 568 (1995)).

First, Section 922(d) provides a limited exception to the automatic stay provisions for "application of pledged special revenues . . . to payment of indebtedness secured by such revenues." 11 U.S.C. § 922(d). The panel concluded that this exception unambiguously means that payment of special revenues to bondholders is permissible during the bankruptcy proceeding, but only when the debtor voluntarily chooses to make such a payment. It then held that the section authorizes bondholders who have received but not yet applied those revenues to the debt to go ahead and do so (as though that were the problem to be solved). See Assured Guaranty, 919 F.3d at 130.

I disagree with the panel opinion about the likely meaning of Section 922(d), and at the least would find its text ambiguous. The statute begins: "Notwithstanding section 362 of this title and subsection (a) of this section . . . ." 11 U.S.C. § 922(d). Section 362(a) refers in part to "any act to create, perfect, or enforce any lien against property of the estate," id. § 362(a)(4) (emphasis added), and Section 922(a) similarly refers in part to the "enforcement of a lien," id. § 922(a)(2). The Supreme Court has explained that "in construing statutes, the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." Cisneros v. Alpine Ridge Grp., 508 U.S. 10, 18 (1993). On the panel's narrow understanding, there is no conflict because the stay provisions do not prohibit the debtor from making voluntary payment. In my view, the use of the word "notwithstanding" makes it unlikely that, in Section 922(d), Congress intended only to allow the debtor to voluntarily pay the pledged revenues at the debtor's whim. I point out that, in general, the stay provisions do not refer to any voluntary actions taken by the debtor, as opposed to actions directly against the debtor.

Nor does the language support the panel's reading that the clause has to do with what the bondholder can do when it has received such a payment but (in essence) has not cashed it. So, my disagreement also extends to the panel's narrow interpretation of the word "application" in Section 922.[11] The statute does not use "application" as a term standing alone, but in reference

---

[10] See also King v. Burwell, 135 S. Ct. 2480, 2489 (2015) ("[O]ftentimes the meaning -- or ambiguity -- of certain words or phrases may only become evident when placed in context."). As the Supreme Court has said, "clear evidence of congressional intent may illuminate ambiguous text." Milner v. Dep't of Navy, 562 U.S. 562, 572 (2011); accord Azar v. Allina Health Servs., 139 S. Ct. 1804, 1814 (2019) ("[C]lear legislative history can illuminate ambiguous text." (internal quotation marks omitted)).

[11] The plain meaning of the full phrase is not luminously clear from the text alone; roughly contemporary dictionaries have quite broad definitions of "application." See, e.g., "Application," Black's Deluxe Law Dictionary (6th ed. 1990) (defining "application" as, in the "Payments" context, "[a]ppropriation of a payment to some particular debt"); "Application," Oxford English Dictionary (2nd ed. 1989) (defining "application" in numerous, and broad, ways).

- 15 -

to the "payment of indebtedness secured by such revenues." 11 U.S.C. § 922(d) (emphasis added). Even the section of Collier relied on by the panel and the concurrence accepts that "it can be argued that the word 'application' . . . means that the municipality must pay over to the creditor special revenues in the possession of the municipality." 6 Collier on Bankruptcy ¶ 922.05 (16th ed. 2018). A different bankruptcy treatise seemed to accept the Jefferson County view that "[Section] 922(d) applies not only to revenues in the hands of the trustee, but also requires the debtor to continue to pay over post-petition revenues for application in accordance with the indenture." 5 Norton Bankruptcy Law and Practice 3d § 90:13 (2019).

Beyond that, application of pledged revenues that a bondholder already holds is not and never was clearly barred by the automatic stay provisions, so that does not justify the panel's narrow reading of "application." See 11 U.S.C. § 904 (protecting "the debtor's use or enjoyment of any income-producing property" from "interfere[nce]"). So, this statutory language about application, when understood in context, may well be understood as allowing enforcement of these particular liens, in situations like this where continued payment is not made according to the terms of the issuance. To be clear, I do not read the word "application" alone to mean to "commence a judicial proceeding." Rather, Section 922(d) as a whole can be read as allowing enforcement (through a judicial proceeding if necessary) by creating a prospective exception to the stay for the required continued payment of special revenues in accordance with the indenture. "Application . . . to the payment of indebtedness" is a mandatory process, on this understanding, and so the debtor can sue to enforce it as necessary.[12]

Second, Section 928(a) can be reasonably read more broadly than how the panel read it, that "consensual prepetition liens on special revenues will remain in place after the filing of the petition." Assured Guaranty, 919 F.3d at 128. The statute says that "special revenues acquired by the debtor after the commencement of the case shall remain subject" to such liens, 11 U.S.C. § 928(a) (emphasis added); this can plausibly be read as contemplating enforcement of the liens when necessary to forestall the debtor from diverting and subsequently misusing the pledged revenues, just as is happening here (taking the pleadings to be true). This interpretation would provide more protection to the lienholders without requiring recourse to a lift-stay motion (which I discuss further below).

Proximate statutory context supports this view. Section 928(b) provides that such "lien[s] on special revenues" "shall be subject to the necessary operating expenses of such project or system." Id. § 928(b). If continued payment of special revenues were merely voluntary during the pendency of a bankruptcy proceeding due to the automatic stay provisions, this carveout would have little practical effect; municipalities concerned about meeting the operating expenses of a project or system could simply choose not to pay pledged special revenues at all during the pendency of bankruptcy proceedings, with no concern for setting aside only the necessary operating expenses.

---

[12]    Deploying a motor vehicles/electric bikes/kayaks analogy, the concurrence warns of "exceed[ing] the license afforded by the relevant ambiguity" in the statute. I disagree that this is an apt analogy at all, nor does it eliminate the need to consider the legislative history and context. Nor am I "hunt[ing] the legislative record for bigger game" in my consideration of relevant extrinsic materials.

- 16 -

B.    Legislative History of the 1988 Amendments Supports the Insurers' Position

Having shown there are different ways to read the language from the text alone, I turn back to the Senate and House Reports and, to a much lesser degree, submissions to the Senate Subcommittee on Courts and Administrative Practice regarding the 1988 amendments. For the latter category, I look in particular at statements and testimony by James W. Perkins, Lawrence P. King, and James E. Spiotto, because this testimony is referred to in the Senate Report.[13] S. Rep. No.100-506, at 2. Importantly, those submissions comport with statements in the reports, and with a reasonable reading of the terms in the eventual statute.[14] I first consider legislative history as related to specific words in the statutes, and then consider more closely the purposes of the 1988 amendments as expressed by Congress.[15]

The Congressional sources do not support the view that the term "application" only refers to the situation where a municipality wants to pay pledged revenues voluntarily but has not yet paid them to an indenture trustee. Nor do they support the views that "pledged revenues" only refers to such revenues that have already been received by an indenture trustee but not yet applied, or to such revenues that the creditor itself has in hand and wants to apply to the debt.

Instead, the Senate Report states more broadly that, by the amendments, the automatic stay "is made inapplicable to the payment of principal and interest on municipal bonds paid from pledged revenues." Id. at 13 (emphasis added). The House Report is also explicit about payment:

> To help achieve a primary goal of the bill, new subsection (d) to section 922 states that the automatic stay of Bankruptcy Code section 362 does not operate to stay paying pledged revenues, consistent with new section 92[8] of the Bankruptcy Code, to the revenue bondholders holding liens on such revenues.

---

[13]    Though "excerpts from committee hearings" can be "among the least illuminating forms of legislative history," Advocate Health Care Network v. Stapleton, 137 S. Ct. 1652, 1661 (2017) (quoting N.L.R.B. v. SW Gen., Inc., 137 S. Ct. 929, 943 (2017)), formal submissions that correlate closely to the official Congressional reports -- and are in fact cited by the Reports -- can still provide some value in discerning congressional intent.

[14]    It is significant that one of the experts on whom Congress relied has taken the position that the panel opinion is incorrect (and previously took the position that the district court was incorrect in this case). See James Spiotto, The First Circuit Court of Appeals Ruling on 'Assured' Should be Reheard or Reversed; Recent Ruling Sends a Harsh Message to Municipal Bond Market, MuniNet Guide (Apr. 3, 2019), https://muninetguide.com/the-first-circuit-court-of-appeals-ruling-on-assured-should-be-reheard-or-reversed-recent-ruling-sends-a-harsh-message-to-municipal-bond-market (stating that the panel opinion "was contrary to all prior case law . . . by courts hearing Chapter 9 cases, the recognized commentaries on special revenues and the legislative history for the 1988 Amendments to the Federal Bankruptcy Code").

[15]    By considering the "reliable light" shed on parts of the statutory scheme by the legislative history, Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005), this section gives proper respect to Congress.

H.R. Rep. No. 100-1011, at 7 (emphasis added).  The word "voluntarily" cannot be read into this reference to "paying."[16]  "Consistent with [Section 928]" means, then, that payment of the "special revenues acquired by the debtor after the commencement of the case" would happen after the municipality deducts the "necessary operating expenses of [the] project or system."  11 U.S.C. § 928(b).  Reading "application . . . to payment of indebtedness" as only referring to a situation where a creditor or indenture trustee <u>already has</u> the funds cannot be squared with the broader references to payment in the Reports.

Relatedly, as to the definition of "pledged revenues," the Senate Report states that pledged revenues "[i]n this context" "includes funds in the possession of the bond trustee as well as other pledged revenues."  S. Rep. No. 100-506, at 13.  The appellee PROMESA Board argues that the Report was unclear on this point, and so the statement does not cut either way.  But "other pledged revenues" seems to mean what it says: all the rest of the pledged revenues that are not, at that time, "in the possession of the bond trustee."  <u>Id.</u>  So again, the legislative history does not support the view that yet-uncollected pledged revenues (to be paid to bondholders prospectively) are excised from the meaning of "pledged revenues" in the amendments.  <u>See</u> 11 U.S.C. § 902(2) (defining "special revenues").  Nor does it support the view that the amendments only target already-paid installments held by the bondholders (or, in the same vein, already-escrowed payments to an indenture trustee).  My views are consistent with the definition of "pledged revenues" in a municipal bond handbook.  <u>See</u> <u>The Handbook of Municipal Bonds</u> 1295 (Sylvan G. Feldstein & Frank J. Fabozzi eds., 2012) (defining "pledged revenues" as "[r]evenues legally pledged to the repayment of a bond").

As to the legislative history demonstrating the relevant goals of the 1988 amendments, in its overview summarizing the "significant amendments" to the law made by the 1988 amendments, the Senate Report states that "the amendments insure that revenue bondholders [will] receive the benefit of their bargain with the municipal issuer, namely, they will have unimpaired rights to the project revenue pledged to them."  S. Rep. No. 100-506, at 12.  This statement, in my view, is general and not in reference only to one of the amended provisions, as the concurrence argues.  Several experts who provided statements or testimony at the Senate subcommittee hearing made similar points to mine.  <u>See</u> <u>Bills Pertaining to Title 11 of the United States Code, The Bankruptcy Code Hearing on S. 1626, S. 1358, S. 1863, and S. 2279 Before the Subcomm. on Courts and Admin. Practice of the S. Comm. on the Judiciary</u>, 100th Cong. 532 (1988) (statement of James E. Spiotto) ("[T]he bill preserves the bargain that was made by all the

---

<sup></sup>    [16]    The Statement of the National Bankruptcy Conference explained this portion of the proposed amendments similarly to the Senate's conclusion:  "Pledged revenues received after the commencement of the bankruptcy case would be applied first to the operating expenses of the system, project or function producing the revenues . . . before application to the indebtedness for which the revenues were pledged and only then to other lawful purposes."  <u>Bills Pertaining to Title 11 of the United States Code, The Bankruptcy Code Hearing on S. 1626, S. 1358, S. 1863, and S. 2279 Before the Subcomm. on Courts and Admin. Practice of the S. Comm. on the Judiciary</u>, 100th Cong. 556 (1988).  "Received" can only refer to receipt by the <u>debtor</u> here (who runs the project or system at issue), because the sentence allows for the application to the operating expenses first.  <u>See</u> <u>id.</u> at 534-565.

- 18 -

parties . . . ."); id. at 528 (statement of James W. Perkins) ("[T]he bill preserves the bargain that was made.").

Rights of revenue bondholders to special revenues are not "unimpaired" if the payments are not made but put off indefinitely, and are even more impaired if there is no guarantee that any of the pledged revenue will be paid, if at all, until the end of a bankruptcy proceeding. And they are certainly not "unimpaired" if, during the bankruptcy proceeding, the debtor can divert and spend the pledged revenues in ways unrelated to the necessary operating expenses of the project or system or the special revenue payment obligations. Further, as to the "bargain" struck between parties when revenue bonds are issued and sold, surely it involves the payment of the pledged revenues, not just giving the issuing municipality the option to pay or not during a bankruptcy proceeding (which may take years).

Next, the Senate Report stresses that "[r]easonable assurance of timely payment is essential to the orderly marketing of municipal bonds and notes and continued municipal financing." S. Rep. No. 100-506, at 21. This statement favors the bondholders' view. If Congress simply intended the amendments to prevent a (possibly unconstitutional) destruction of a lien, the panel's result would seem to subvert this intent. The panel's narrow understanding here also does little to support the "essential" "reasonable assurance" for creditors of "timely payment." A creditor, as the panel has it, would be left at the mercy of whether the debtor will decide to make voluntary payment (a highly unlikely scenario in many situations, as exemplified by the present case). Payment, in that event, cannot be said to be "timely" when municipalities, by their choices, can force the special revenue bondholders to wait for payment until the end of the bankruptcy proceeding. And I do not ignore the "reasonable" qualifier to "assurance," but cannot see that the mere allowance of voluntary payment would provide any real assurance that, when push comes to shove and a municipality files for bankruptcy, creditors will receive "timely payment" of pledged special revenues.[17]

Finally, the Senate Report states that "[w]here a pledge of revenues survives . . . it would be needlessly disruptive to financial markets for the effectuation of the pledge to be frustrated by an automatic stay."[18] Id. (emphasis added). Creating an exception to the stay that is

---

[17] The concurrence argues that I ignore the "larger context" of the amendments here, and points to examples in the Senate and House Reports about "municipalities electing to continue making payments to bondholders after filing for bankruptcy." The Senate Report gives examples of a city and a school district that "ignore[d] [Section 552] and continue[d] to pay the bondholders as originally promised," S. Rep. 100-506, at 6, and the House Report similarly describes "continued post-petition" payments made by the school district "in the same manner as if no bankruptcy ha[d] been filed," H.R. Rep. No. 100-1011, at 3. But the provision those municipalities ignored was only one that "terminated" the pledge. S. Rep. 100-506, at 12; see 11 U.S.C. § 552(a) ("[P]roperty acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.").

[18] "[E]ffectuation of the pledge" most likely means continued payment of the pledged revenues and enforcement of liens if needed to obtain payment. The payment of revenues to

- 19 -

limited only to a choice by a municipality of whether to continue payment would not prevent "disrupti[ons]" to the financial markets, contrary to Congress's clearly-stated intent to avoid such disruptions. Id.

C.      PROMESA Section 305 Does Not Require a Narrower Reading

I disagree with the panel opinion, and with a later opinion building in part off of that opinion, that Section 305 of PROMESA (which closely resembles Section 904 of the Bankruptcy Code) requires that Section 922(d) be interpreted narrowly. See Assured Guaranty, 919 F.3d at 131; Ambac Insurance Corp., 927 F.3d at 602-03. Here, I believe Section 928 is relevant as well.

Section 305 of PROMESA states:

Subject to the limitations set forth in subchapters I and II of this chapter, notwithstanding any power of the court, unless the Oversight Board consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with--

(1) any of the political or governmental powers of the debtor;

(2) any of the property or revenues of the debtor; or

(3) the use or enjoyment by the debtor of any income-producing property.

48 U.S.C. § 2165. This court has stated that Section 305 is intended to be "respectful and protective of the status of the Commonwealth and its instrumentalities as governments, much like section 904 of the municipal bankruptcy code respects and protects the autonomy of states and their political subdivisions." Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd. for P.R.) (PREPA), 899 F.3d 13, 21 (1st Cir. 2018). But Section 305 does not bar, for example, the Title III court from lifting the automatic stay, id.; instead, it generally protects the Commonwealth from the Title III court "imping[ing] on [the Commonwealth's] autonomy" by "directly interfering." Id.; see Aurelius Capital Master, Ltd. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.), 919 F.3d 638, 648 (1st Cir. 2019).

First, I am not convinced that the prospective relief from the automatic stay granted by Sections 922 and 928 really constitutes the "interference" with which Section 305 is most concerned. As one commentator significantly points out: "The argument that section 904 requires a narrow interpretation is incorrect. If anything, it is the automatic stay which interferes with the normal workings of the affairs of a municipality. Section 922(d) makes the automatic stay inapplicable to revenue bonds and thereby limits the court's sphere of interference over municipal

---

bondholders is what has been pledged between the parties when the bonds were issued and sold, in a straightforward sense, including by enforcement of the liens.

- 20 -

affairs."[19]   David L. Dubrow, <u>Chapter 9 of the Bankruptcy Code: A Viable Option for Municipalities in Fiscal Crisis?</u>, 24 The Urb. Law. 539, 573 (1992).  On my understanding of the statutory scheme, the debtor and the bondholders are left "with the same rights and obligations as prior to the Chapter 9 filing," <u>id.</u>, limiting the Title III court's "interference" (if it can be called that) to merely preserving the situation that the buyer and seller agreed upon at the issuance of the special revenue bonds, including through enforcement of the liens if necessary.  The narrow action by the Title III court would simply prevent "a marked change in the status quo ante undercutting creditor rights" by allowing a debtor to make no special revenue payments during the bankruptcy proceeding, a result I believe is "unlikely to have been implemented by Congress without some discussion and expression of awareness."  <u>PREPA</u>, 899 F.3d at 20.

Again, such special revenue bonds are generally based on a <u>specific</u> project or system and are not usually supported by broader property of the municipality (as general obligation bonds would be).  In this way, the advance exceptions from the automatic stay are more like the bankruptcy or Title III court "merely stand[ing] aside by lifting the automatic stay, . . . allow[ing] the processes of state or territorial law to operate in normal course as if there were no bankruptcy," <u>id.</u> at 21, rather than a normal enforcement action by, for example, a general obligation creditor attempting to jump the line during the pendency of the bankruptcy proceeding.

Second, even if this action were viewed as "interference," some "interference" is plainly necessary under Section 928, as the Board accepts ("Section 928(b) ensures a municipal debtor may elect to apply revenues to pay necessary operating expenses <u>subject to court determinations, in the event of a dispute</u>, over which expenses are 'necessary.'" (emphasis added)).  That is, where there is a dispute over how much of the revenue is actually "necessary" for the debtor to operate the project or system, the court must determine the proper amount -- and so must "interfere" in this limited way with the debtor's property, if the decided amount is lower than the debtor otherwise wishes to keep for the operating of the project or system.  The Senate Report is clear that the court must be involved in making the necessity determination: "Prepetition operating expenses are included [in 'necessary operating expenses'] to the extent payment <u>is deemed necessary by the court</u> for this purpose."  S. Rep. No. 100-506, at 22 (emphasis added).  Limited "interference" to effectuate the goals of Congress in Section 922(d) would be equally appropriate in this narrow context.  The <u>specific</u> stay exceptions, and Congress's intent in enacting them many years after the initial enactment of Section 904,[20] support the view that the stay exceptions construed here override Section 305 in specific and limited ways.  <u>See</u> <u>Nitro-Lift Techs., L.L.C.</u> v. <u>Howard</u>, 568 U.S. 17, 21 (2012) (per curiam) (recognizing the "the ancient interpretive principle that the specific governs the general (<u>generalia specialibus non derogant</u>) [for] . . . laws of equivalent dignity").  That includes enforcement if necessary, where a debtor refuses to make the special revenue payments as promised by the relevant bond resolution(s).

Third and finally, even were I to assume arguendo that the Title III court cannot <u>directly</u> order the payment of the pledged revenues based on Section 305's prohibitions on that

---

[19]   Also, Congress, in the Senate Report, stated its concern that the automatic stay itself might "interfere with the government, affairs and the municipality's use or enjoyment of income producing property."  S. Rep. No. 100-506, at 21.

[20]   Congress was, of course, aware of Section 904 when it made the 1988 amendments; the Senate Report mentions that section multiple times.  S. Rep. No. 100-506, at 6, 9, 21.

court's authority (meaning it cannot directly enforce the liens), I would still agree with the <u>Jefferson County</u> view that "resort to <u>another court</u> for the limited purpose of obtaining the [pledged revenues after deduction of necessary operating expenses] is potentially available should the [debtor] not voluntarily remit the [pledged revenues]," <u>Jefferson County</u>, 474 B.R. at 272 (emphasis added), without first requiring a lift-stay motion to the Title III court. After all, Section 305 does not restrict non-Title III courts. See <u>Ambac Insurance Corp.</u>, 927 F.3d at 605.

III.

There are three other arguments which support my view that merit further consideration.

A.     <u>Superfluity of Section 922(d)</u>

In my view, the bondholders' superfluity argument regarding Section 922(d) has not been dealt with fully either in the original panel opinion or in the revision to the opinion.[21] I am not convinced by the attempt to shift the rationale for rejecting the superfluity argument from an erroneous reliance on a Seventh Circuit opinion to <u>Collier</u>. See <u>Assured Guaranty</u>, 919 F.3d at 132 ("Before Congress adopted the 1988 Amendments there was ample reason to believe that Section 362(a) stayed a creditor from accepting voluntary payments from a debtor or stayed a creditor from applying debtor funds already in the creditor's possession (as security) to the debt." (citing 6 <u>Collier on Bankruptcy</u> ¶ 362.03)). The general statement quoted from <u>Collier</u>[22] about "cashing of checks" is neither authoritative nor adequate. This section of <u>Collier</u> is not directed at, and indeed never refers to, municipal bankruptcies in particular.

At their core, the stay provisions address actions taken <u>against</u> the debtor, not voluntary actions by the debtor. Put simply, the stay provisions do not generally create restrictions on what the debtor may do voluntarily. See 11 U.S.C. § 362(a); <u>id.</u> § 922. The panel's understanding likely renders Section 922(d) superfluous. Even if one disagrees with my conclusion on superfluity, this argument is serious and I believe merits further consideration than that afforded in the panel opinion.

---

[21]     Months after the opinion's initial issuance, after the filing of the en banc petition, and without further briefing, the revision changed the cited support for the rejection of a colorable legal argument, removed the only case citation in that rejection, and changed the phrase "was unclear" to "ample reason to believe." Errata, Dkt. No. 115, <u>Assured Guaranty</u>, 919 F.3d 121 (Nos. 18-1165; 18-1166).
          The Seventh Circuit case initially cited was <u>In re Hellums</u>, 772 F.2d 379 (7th Cir. 1985) (per curiam). Several years before the 1988 amendments, this case noted that its holding "preserve[d] the right of a debtor to voluntarily re-affirm otherwise dischargeable obligations." <u>Id.</u> at 382. I see this as contrary to the panel opinion's view that, before the 1988 amendments, there was reason to believe that voluntary payment (and acceptance of that payment) was not allowed by Chapter 9 during the pendency of the municipal bankruptcy proceeding.
[22]     The parenthetical from the panel opinion is: "[I]nnocent conduct such as the cashing of checks received from account debtors of accounts assigned as security may be a technical violation [of Section 362(a)(6)]." <u>Assured Guaranty</u>, 919 F.3d at 132 (alterations in original) (quoting 6 <u>Collier on Bankruptcy</u> ¶ 362.03)).

- 22 -

B.      Constitutional Concerns and the Canon of Avoidance

The bondholders are correct in their en banc petition that the reasoning in the panel opinion raises concerns under the Takings Clause as well as under the Tenth Amendment. The Supreme Court has held that the "total destruction . . . of all compensable value of . . . liens, which constitute compensable property, has every possible element of a Fifth Amendment 'taking.'" United States v. Sec. Indus. Bank, 459 U.S. 70, 77 (1982) (quoting Armstrong v. United States, 364 U.S. 40, 48 (1960)). But the panel opinion does not mention those concerns or consider the canon of constitutional avoidance.

As a practical matter, the panel opinion allows the Commonwealth to divert and spend the pledged revenues during the pendency of the bankruptcy proceeding, unless the debtor suddenly changes its approach and voluntarily makes payments or the bondholders get the stay lifted for cause, an issue to which I return below. The PRHTA bondholders, and their insurers, may indeed "be left to stand by helplessly as the debtor spen[ds] the creditor's collateral," here the pledged revenues. PREPA, 899 F.3d at 20. The Supreme Court has cautioned us "to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question," Gomez v. United States, 490 U.S. 858, 864 (1989), and my dissent has offered such a reading.[23]

Next, the opinion's holding is not limited to Puerto Rico, in that the interpreted language from the Bankruptcy Code in Sections 922 and 928 was incorporated into PROMESA without alteration. As a result, there may well also be a constitutional avoidance issue as to the Tenth Amendment rights of states to which the holding will apply. Congress intended to preserve state power over regulation of revenue bonds. See H.R. Rep. No. 100-1011, at 7 (stating that Section 928 "leaves the legal and contractual limitations of revenue bonds and state law intact"). Further, the Senate Report noted Tenth Amendment concerns and the importance of "state law mandates." S. Rep. No. 100-506, at 6, 7. This too is not addressed by the panel or concurrence.[24]

C.      Lift-Stay Motions Under Section 362

The panel opinion does not discuss one avenue it presumably leaves open for dissatisfied bondholders in the situation in which the PRHTA bondholders (and the Insurers) find themselves: for them to file a lift-stay motion for cause under Section 362. This section provides, in relevant part:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or

---

[23]     I appreciate that Ambac Insurance Corp., issued after Assured Guaranty, does not foreclose a constitutional challenge "in a separate action" because Section 305 does not restrict non-Title III courts. 927 F.3d at 605.

[24]     It would have been helpful to receive briefing from the state attorneys general in this circuit regarding the effects of the holding on state law and regulation concerning special revenue bonds.

> conditioning such stay -- (1) for cause, including the lack of
> adequate protection of an interest in property of such party in interest
> . . . .

11 U.S.C. §362(d)(1). I simply do not see this as a realistic option here. And, though a lift-stay motion can be a powerful tool, it does not give the special revenue bondholders the protection that Congress intended.

In practice, there are inherent risks for the creditor in moving to lift the stay, including about its ability to meet a good cause requirement. And, on appeal, review is only for abuse of discretion. Fields Station LLC v. Capital Food Corp. of Fields Corner (In Re Capitol Food Corp. of Fields Corner), 490 F.3d 21, 23 (1st Cir. 2007). Relegating petitioners to seeking a lift-stay motion as the only recourse for the debtor's misappropriation of pledged revenues is contrary to what Congress intended. That result would not provide real assurance of timely payment, as necessary for "orderly marketing of municipal bonds and notes and continued municipal financing." S. Rep. No. 100-506, at 21. The panel's result imposes on bondholders the cost and inherent uncertainty of lift-stay litigation and the delay of payment of the pledged revenues, plus the general loss in value caused by that delay. See id. at 11 ("This [automatic stay] provision is overly broad in Chapter 9, requiring the delay and expense arising from a request for relief from the automatic stay . . . ." (emphasis added)).

IV.

I briefly emphasize my strong disagreement with the separate concurrence, beyond what I have already said. I make four points here.

First, as a general matter, the "central issue in this case" is not simply "whether the creditor-bondholders . . . may commence a judicial proceeding against a Commonwealth debtor to obtain a court order restoring the flow of post-petition pledged special revenues from the debtor"; it is whether a debtor -- here, the Commonwealth -- must continue to pay pledged special revenues to bondholders during a bankruptcy proceeding. The enforcement of that lien stems from the mandatory nature of the payment of the special revenues, due to their exemption from the stay. Treating the case as primarily about lien enforcement, should the debtor choose not to pay special revenue bondholders, ignores the broader scheme that Congress has set up for special revenues during municipal bankruptcy proceedings (and incorporated into PROMESA for the Commonwealth's Title III proceeding).

Second, I cannot see that the concurrence's narrow view of Section 922(d) -- that it merely allows special revenues held by a secured creditor or a trustee to be applied to the debt during the bankruptcy proceeding -- effectuates Congress's stated broader interests in, for example, allowing cash-strapped municipalities to raise money and preventing disruptions to the financial markets. The narrow view is surely part of the effect of this section, but hardly the complete effect.

Taking the concurrence's narrow view is damaging, because it will likely harm troubled municipalities' attempts to finance critical systems and projects, contrary to Congress's intent here. That is, potential buyers of revenue bonds with concerns about the general

creditworthiness of a municipality (rather than concerns with the system or project itself) would lack any clear assurance of timely payment of the special revenues, beyond that the potential buyers could eventually apply funds they already held once the municipality went into bankruptcy. This gives scant to no assurance to a diligent prospective buyer. And contrary to the concurrence, the emphasized clause in the Senate Report -- "including application of the debtor's funds held by a secured lender to secure indebtedness" -- is best read as an example rather than a comprehensive category, given the following sentence's broader reference to "the application of pledged revenues after payment of operating expenses to the payment of secured bonds" with no qualification as to the holder of the special revenues. S. Rep. 100-506, at 11.

Third, the concurrence misconstrues my concern about the canon of constitutional avoidance. The view in the panel opinion and concurrence of the interplay between Section 362 and special revenues does raise Takings concerns. In a situation like this, where special revenues have been diverted (taking the pleadings as true), I cannot see that "the value of the secured position of a creditor [is] maintained during the stay." United Sav. Ass'ns of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.) 793 F.2d 1380, 1390 (5th Cir. 1986).

Fourth, as explained above, my constitutional concerns also go the Tenth Amendment. This concern relates specifically to statutory amendments made forty years after the 1938 Supreme Court case cited by the concurrence, which is accordingly of little relevance. See The Bankruptcy Reform Act of 1978, Pub. L. No. 95–598, 92 Stat. 2549; see also Bekins, 304 U.S. at 51–52. The potential interference with state schemes for special revenues, and for municipal financing more generally, merits serious consideration.

*   *   *

For these reasons, I respectfully dissent and urge further review.

By the Court:

Maria R. Hamilton, Clerk

cc:
Hon. Laura Taylor Swain
Frances Rios de Moran, Clerk, United States District Court for the District of Puerto Rico
Heriberto J. Burgos-Perez
Ricardo F. Casellas-Sanchez
Diana Perez-Seda
Howard Robert Hawkins Jr.
Lary Stromfeld
Mark C. Ellenberg
Ellen M. Halstead
Casey J. Servais
Ellen V. Holloman
Gillian G. Burns
Thomas J. Curtin
Maria Emilia Pico

- 25 -

Martin A. Sosland
Jason W. Callen
Eric Perez-Ochoa
Luis A. Oliver-Fraticelli
Gregory Silbert
Jonathan D. Polkes
Salvatore A. Romanello
Hermann D. Bauer-Alvarez
Timothy W. Mungovan
Stephen L. Ratner
John E. Roberts
Mark David Harris
Martin J. Bienenstock
Daniel Jose Perez-Refojos
Michael A. Firestein
Lary Alan Rappaport
Jeffrey W. Levitan
Andres W. Lopez
Elizabeth Lemond McKeen
Peter M. Friedman
John J. Rapisardi
Suzzanne Uhland
Wandymar Burgos-Vargas
Carlos Lugo-Fiol
Luis R. Roman-Negron
Raul Castellanos-Malave
Jose Ramon Rivera-Morales
Lawrence S. Robbins
Richard A. Rosen
Mark Stancil
Donald Burke
Ariel N. Lavinbuk
Lanora Christine Pettit
Kyle J. Kimpler
Walter Rieman
Andrew N. Rosenberg
Karen R. Zeituni
Diana M. Batlle-Barasorda
Juan J. Casillas-Ayala
Luc A. Despins
Alberto Juan Enrique Aneses-Negron
Georg Alexander Bongartz
Laura Appleby
Aaron Maxwell Krieger
Steven Wilamowsky
Vincent J. Marriott III

Chantelle McClamb
Paul John Ricotta
William W. Kannel